Estate of Jacques Granat, Deceased, Edwin Arnowitt, Executor v. Commissioner. Estate of Jacques Granat, Deceased, Edwin Arnowitt, Executor, and Mae Granat v. Commissioner.
Estate of Granat v. Commissioner
Docket Nos. 69728, 77753.
United States Tax Court
T.C. Memo 1960-171; 1960 Tax Ct. Memo LEXIS 107; 19 T.C.M. (CCH) 918; T.C.M. (RIA) 60171; August 31, 1960
*107 Jay S. Goodman, Esq., 450 Seventh Avenue, New York, N. Y., for the petitioners. James J. Quinn, Esq., and Robert S. Bevan, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings respondent determined deficiencies in income tax and additions to tax as follows: Additions to Tax - I.R.C. 1939
Year
Deficiency
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
(Docket No. 69728)
1947
$ 3,046.48
$ 1,523.24
$ 269.17
$ 179.44
1949
2,486.74
1,243.37
223.81
149.20
1950
160,172.80
80,086.40
14,415.55
9,610.37
1951
128,462.03
64,231.02
11,573.42
7,715.60
1952
19,739.07
9,869.54
1,191.42
(Docket No. 77753)
1948
5,423.56
2,711.78
487.30
324.88
1953
819.90
409.95
66.35
1954
923.72
* 461.86
43.39
The issues are: (1) Whether Jacques Granat, petitioners' decedent, hereinafter called Granat, failed to report income from a printing and stationery business in the respective amounts of $831.15, $2,259.25, $3,793.24, $4,029.75, $4,947.79, $1,529.53, $1,205.79 and $1,587.61 from 1947 through *108 1954; (2) Whether Granat omitted interest income from certain loans in the respective amounts of $1,121.87, $1,351.68, $3,016.50 and $4,529.63 from 1948 through 1951; (3) Whether unidentified and unexplained deposits to Granat's bank accounts in the respective amounts of $11,671.25, $20,042.59, $6,497.33, $212,037.93, $156,597.73, $35,222.10, $2,145.82 and $1,728.57 from 1947 through 1954 constituted taxable income; (4) Whether Granat omitted from income a salary of $1,500 for each of the years 1950 and 1951; (5) Whether Granat incurred a business bad debt in the amount of $7,380 as a result of the worthlessness of some of the loans referred to., (6) Whether Granat filed false and fraudulent returns with intent to evade tax for each of the years 1947 through 1951 and 1953 so that assessment of the deficiencies and additions to tax for those years is not barred by the statute of limitations; (7) Whether any part of any deficiency is due to fraud with intent to evade tax; and (8) Whether additions to tax under sections 294(d)(1)(A), from 1947 through 1951, and 294(d)(2), from 1952 through 1954, were properly imposed. Respondent concedes that there should be no section *109 294(d)(2) addition to tax from 1947 through 1951. Petitioners abandoned any issue as to other adjustments referred to in respondent's deficiency notices and certain claims for additional deductions referred to in the petitions. Findings of Fact The stipulated facts are found. Jacques Granat died on April 4, 1957. Petitioners are his estate by its executor, Edwin Arnowitt, hereinafter called Arnowitt, in Docket Nos. 69728 and 77753, and Granat's wife in Docket No. 77753 by reason of her having filed joint returns. Granat filed individual returns with the collector of internal revenue for the second district of New York for 1947, 1949 and 1950, and with the collector for the first district of New York for 1951. He filed his 1952 return with the director of internal revenue, Brooklyn, New York. Granat and his wife filed joint returns with the collector of internal revenue for the second district of New York for 1948, and with the director of internal revenue, Brooklyn, New York for 1953 and 1954. The returns from 1947 through 1954 reported gross income as follows (in even dollars): Salary as Mes-
Net Profit
Adjusted
Taxable
senger (Telephone
Stationery
Gross
Year
Order) Clerk
Rent
Business
Income
1947
$ 950
$ 950
1948
780
$1,040
1,820
1949
1,200
1,200
1950
1,290
1,290
1951
2,147
$ 667
2,815
1952
2,113
596
2,709
1953
2,030
1,775
3,805
1954
2,205
884
2,214
*110 From approximately 1939 to October 1952, Granat and his family lived in an apartment which rented for $43 per month. On October 29, 1952, they moved into a new house. Until October 1952, Granat gave his wife $25 per week for purposes of maintaining the family household. After that time, he gave her $32 per week. His wife also received $30 per month from her older daughter from 1947 until sometime in 1952, when the daughter married and left the family home. Granat's wife expended these sums for general household purposes and for her own personal clothing. Granat never discussed his business affairs with any member of his family. He kept cash in a metal box at home. His family never knew how much cash was in this box. During the years in issue, the Granat family lived modestly. They had no automobile and never took vacations. Issue 1 Unreported Income from Stationery Business From 1947 through 1954, Granat's regular occupation was a messenger clerk for member firms of the New York Curb Exchange. During this same period, he was also engaged in selling printing and stationery supplies, sometimes hereinafter called the stationery business. In operating this business, Granat *111 would take orders for printing and stationery supplies, have them executed by a supplier, and make manual deliveries himself. From 1947 through 1950, Granat's total sales receipts from his stationery business were at least $831.15, $2,259.25, $4,093.03 and $8,327.57, respectively. He failed to report any part of these amounts for his respective returns for those years. Granat's returns from 1951 through 1954 reported the following items pertaining to the stationery business (in even dollars): 1951
1952
1953
1954
Total receipts
$5,913
$10,703
$10,505
$15,684
Less: Cost of goods sold
4,736
9,221
7,621
13,253
Gross profit
$1,177
$ 1,481
$ 2,884
$ 2,430
Less: Other business deductions
509
885
1,108
1,546
Net profit
$ 667
$ 596
$ 1,775
$ 884
In 1951, Granat's total sales receipts from his stationery business were at least $10,931.03 instead of $5,913.92. From 1952 through 1954, Granat's total sales receipts from his stationery business were $12,251.12, $11,711.48 and $17,271.66, respectively. These receipts were represented by checks deposited to Granat's account at the Corn Exchange Bank Trust Company, hereinafter called Corn *112 Exchange, which were not reflected in his respective returns. Arnowitt, a certified public accountant, met Granat in August 1951. Granat retained him to perform accounting services. From 1951 through 1954, Arnowitt maintained a set of double entry books and records for Granat and prepared the individual and joint returns in controversy. The information appearing on these returns came from the books and records maintained by Arnowitt and from books and records supplied by Granat. Arnowitt had no knowledge of Granat's account at Corn Exchange. The returns for those years do not include any income which may have been deposited in this account. In June 1956, Arnowitt refused to allow respondent's special agent to examine Granat's 1951 through 1954 books and records. Granat refused to allow this agent to examine the books and records for 1947 and 1948, if any. For the years 1947 through 1951, respondent determined that Granat had received unreported income from the stationery business in the respective amounts of $831.15, $2,259.25, $3,793.24, $4,029.75 and $4,947.79. Respondent's agents based these amounts upon the unreported receipts less allowed deductions which they determined *113 for 1947 through 1950 from information supplied by Granat's customers and suppliers. For the year 1951, respondent allowed the costs and expenses claimed on the return. For the years 1952 through 1954, respondent determined that Granat had received unreported income from the stationery business in the respective amounts [1] of $1,529.53, $1,205.79 and $1,587.61 and allowed the costs and expenses claimed on the respective returns. Respondent's agents based the unreported amounts upon the checks deposited to Granat's account at Corn Exchange. Issue 2 Unreported Interest Income From time to time during the period from 1947 through 1951, a man named Johnston, a member of the New York Curb Exchange, borrowed money from Granat and always paid him interest. On one or two occasions prior to 1950, and several times during 1950 and 1951, Johnston paid Granat interest at the rate of 10 per cent per month. Johnston did not deduct these interest payments on his own tax returns. During 1947 through part of 1951, Johnston drew checks on his account at the Colonial *114 Trust Company, New York City, made payable to Granat or to cash, as follows: Total of All
Total
Number of
Number of
Checks (In
Number
Checks Pay-
Checks Pay-
Year
Even Dollars)
of Checks
able to Granat
able to Cash
1947
$ 372
4
3
1
1948
12,277
50
26
24
1949
14,868
50
41
9
1950
33,182
111
108
3
1951
49,826
85
85
0
Totals
$110,526
300
263
37 Granat endorsed all of these checks. Based upon information supplied by Johnston during an investigation of Granat's returns that these checks represented repayments of loans, respondent's agents computed as interest one-eleventh of the total dollar amounts for each year. In his deficiency notices respondent determined unreported interest income as follows (in even dollars): Interest
income from
Interest
Total unre-
Taxable
savings
income
ported inter-
Year
accounts
from loans
est income
1947
$ 5
$ 33
$ 39
1948
*
*
1,121
1949
6
1,351
1,357
1950
5
3,016
3,021
1951
17
4,529
4,547
1952
34
34
1953
*
*
55
1954
*
*
95
Some of the checks drawn on Johnston's account at *115 the Colonial Trust Company represented payments connected with loans made to Johnston by Granat. Others represented checks that Johnston asked Granat to cash for him. For the years 1947 through 1951, and 1952 and 1954, Granat omitted interest income in the respective amounts of at least $39, $1,121, $1,357, $3,021, $4,547, $34, and $95. Issue 3 Unidentified Bank Deposits During the years 1947 through 1949, and from August 21, 1951 through 1954, Granat maintained a checking account at the Trust Company of North America, New York City, hereinafter called the Trust Company. For this period, the total deposits into and withdrawals from this account, and the December 31 year-end balance, were as follows (in even dollars): Total
Total
December 31
Year
deposits
withdrawals
balance
1947
$13,749
$16,053
$ 599
1948
37,489
32,228
5,859
1949
27,608
26,265
7,202
8-21 -
12-31-51
6,976
4,680
2,295
1952
11,240
10,554
2,981
1953
10,798
10,554
3,235
1954
15,613
16,600
2,248
During the years 1950 through 1954, Granat maintained a checking account at the Corn Exchange. For this period, the total deposits into and withdrawals from this *116 account, deposits of currency, and December 31 year-end balance, were as follows (in even dollars): Decem-
Deposits
Total
With-
ber 31
of
Year
deposits
drawals
balance
currency
1950
$252,512
$245,014
$ 7,498
$ 1,365
1951
219,534
221,864
5,167
18,180
1952
38,867
30,396
13,638
30,233
1953
5,406
11,401
7,643
550
1954
5,872
5,865
7,650
*
During 1951 and 1952, Granat's wife maintained a savings account at the Brooklyn Savings Bank. During these years, there were deposits to this account totaling $1,410. This amount was still on deposit at the end of 1954. During 1953 and 1954, Granat's wife maintained a savings account at the Dime Savings Bank of Brooklyn. During these years, there were deposits to this account totaling $1,248.09, and no withdrawals. In 1954, Granat and his wife maintained joint savings accounts at the Dime Savings Bank of Brooklyn, Williamsburgh Savings Bank and East New York Savings Bank. During this year, there was a deposit of $500 into each of these accounts, and at the end of the year the moneys were still on deposit. Respondent determined income from *117 unidentified bank deposits, in addition to that determined for unreported stationery business, interest and salary income, as follows (in even dollars): Amount of de-
Bank ac-
Taxable
posits determined
count in which
year
as income
deposits were made
1947
$11,671
Trust Company
1948
20,042
Trust Company
1949
6,497
Trust Company
1950
212,037
Corn Exchange
1951
156,597
Corn Exchange
1952
35,222
Corn Exchange
1953
2,145
Corn Exchange
1954
1,728
Corn Exchange In the preliminary computations, respondent's agents subtracted from the total deposits in each year the respective checks made payable to Granat or to cash and endorsed by Granat (Issue 2), and all income determined or known to have been received from other sources. In 1950 and 1951, Johnston gave both his and his customers' checks to Granat in exchange for cash or Granat's checks. Each time Granat cashed a check for Johnston he would receive a fee. From 1947 through 1951, Johnston was largely responsible for the volume of exchanged checks that went through Granat's account at the Corn Exchange. Respondent's agents received no definite information in their attempt to determine *118 which, or if any, of Johnston's checks, or those of his customers, were deposited into Granat's account at the Corn Exchange. The agents also noted that there were numerous withdrawals from this account. Their attempts to obtain records from Granat and the Corn Exchange for purposes of determining the nature of these withdrawals were unsuccessful. The special agent was denied access to Granat's canceled checks and checkbook stubs. Respondent's agents attempted to determine Granat's net worth, but were unsuccessful. For the years 1947 through 1951, and 1952 and 1954, in addition to the specific amounts already found to have been omitted, Granat omitted income deposited to his bank accounts in the respective amounts of $11,671, $20,042, $6,497, $12,000, $12,000, $6,000 and $1,728. Issue 4 Unreported Salaries Respondent determined additional salary income in the amount of $1,500 for each of the years 1950 and 1951. In addition to items already referred to, Johnston, in each of the years 1950 and 1951, paid Granat the equivalent of $50 per week for approximately 30 weeks. Granat did not report these items on his returns for 1950 and 1951. Issue 5 Business Bad Debt In 1951, *119 Johnston was indicted for misappropriating $180,000. He pleaded guilty to grand larceny in the first degree and received a suspended sentence. On August 6, 1951, the Committee on Business Conduct of the New York Curb Exchange called Granat before it and questioned him about the affairs of Johnston. On November 8, 1951, a petition in bankruptcy was filed against Johnston in the United States District Court for the Southern District of New York. On November 26, 1951, Johnston defaulted and was adjudicated a bankrupt. He was insolvent to the extent of $300,000. At the same time, he waived his right under the Bankruptcy Act to a discharge from his debts as a bankrupt. Granat was among those listed as a possible creditor of the bankrupt. During the course of the proceeding, the trustee in bankruptcy received approximately $9,500 from the assets of Johnston for the benefit of the bankrupt estate. After the trustee's payment of administration expenses and claims of priority creditors, there remained between $8,000 and $9,000 in the bankrupt's estate for distribution to general creditors. This amount was distributed to general creditors during the latter part of 1953, and represents *120 approximately 5 per cent of the total unverified claims of general creditors. Granat did not file in the bankruptcy proceeding a claim as a creditor of Johnston, nor did he receive any of the distributions made to the general creditors. The files of the District Court for the Southern District of New York indicate that the matter of William J. Johnston in bankruptcy was closed on March 23, 1954. From 1951 through 1954, Johnston made a smail restitution of moneys he had misappropriated. Johnston signed the following promissory notes and checks payable to Granat: Promissory notes
Date
Amount
10-10-50
$1,000
12- 8-50
900
March 1951
1,000
3-30-51
1,000
6-17-51
900
6-25-51
1,050
7- 2-51
1,950
Total
$7,800
Checks
7-17-50
$ 315
7-18-50
315
7-19-50
315
Aug. 28 *
360
Total
$1,305
Total promissory notes and checks: $9,105. None of these notes and checks was negotiated. They represented loans made to Johnston by Granat. The amount of $7,011 of these notes and checks became worthless in 1953 and constituted a business bad debt for that year. Granat did not deduct this amount on either his 1951 *121 or 1953 return. Granat was in the business of lending money for profit. Except for the taxable years 1952 and 1954, for which Forms 872 were executed, the deficiency notices in Docket Nos. 69728 and 77753 were mailed more than 3 years after the date the returns were filed. For each of the years from 1947 through 1951, Granat filed false and fraudulent returns with intent to evade tax. A part of the deficiency for each such year and for 1952 and 1954 is due to fraud with intent to evade tax. Assessment of the deficiencies and additions to tax for each of the years from 1947 through 1951 is not barred by the statute of limitations. Opinion On the issue of fraud we have found that for the years 1947 through 1951, decedent's conduct evidenced a consistently fraudulent pattern of understatement of income and, hence, the statute of limitations is no bar for those years. This conclusion is supported by a number of factors as well as by the record as a whole. Regular and long-continued omissions from income on the part of decedent are virtually conceded by petitioners. These amounts may not have been large, but they were a considerable percentage of the income that was reported. *122 In addition, we have found at petitioners' request, in connection with the bad debt issue, that decedent was in the business of lending money. It necessarily follows that he received interest income, [2] and this also was unreported. It may have been substantial since petitioners say in their brief: "* * * Granat lent Johnston thousands of dollars * * *." To say the least, several likely sources of unreported income have been shown or are admitted. Holland v. United States, 348 U.S. 121. And what was the possibility that decedent was able to accumulate "thousands of dollars" out of the income which he did report? Decedent was in or on the fringe of various aspects of the financial community. It is not reasonable to assume that he was unaware of his obligation to report all of his income. At least the evidence adduced is sufficient to shift the burden of disproving fraud to petitioners, and this has not been borne. If more were needed, the failure to cooperate in the examination of decedent's affairs, his withholding of information from his own accountant, and the *123 maintenance of an undisclosed bank account are all confirmatory of fraudulent intent. Spies v. United States, 317 U.S. 492; Lillian Kilpatrick, 22 T.C. 446, affd. (C.A. 5) 227 F. 2d 240. For the years 1947-1951, therefore, as well as 1952 and 1954, the statute of limitations does not apply. Respondent's obligation in meeting the burden placed upon him to sustain the addition to tax for fraud is limited to any part of any existing deficiency. Sec. 293(b), I.R.C. 1939. It would hence be of little moment that there might have existed some offsetting items for cost of goods used in the stationery business which, parenthetically, petitioners elected not to demonstrate, [3] or that the total amount of loans upon which unreported interest income was determined may have been somewhat less than that determined. As to both of these items, neither decedent, while alive, nor petitioners now, have given, as in M. Rea Gano, 19 B.T.A. 518, 533, even "a patently lame and untenable excuse." *124 Respondent was initially justified in resorting to the bank deposit method, absent any proper accounting records maintained by decedent. See Louis Halle, 7 T.C. 245, 250, affd. (C.A. 2) 175 F. 2d 500, certiorari denied 338 U.S. 949; Estate of Robert Lyons Hague, 45 B.T.A. 104, affd. (C.A. 2) 132 F. 2d 775, certiorari denied 318 U.S. 787. While their existence does not alone necessitate an inference of income, see Denny York, 24 T.C. 742; Goe v. Commissioner, (C.A. 3) 198 F. 2d 851, certiorari denied 344 U.S. 897, affirming a Memorandum Opinion of this Court, we are convinced that certain portions must have represented taxable income not accounted for elsewhere, and that they can be associated with identifiable income-producing activities. Not only have petitioners interposed no objection to the finding that decedent's stationery receipts were "at least" the amounts determined by respondent, but the record, as well as all reasonable inferences, demonstrates that the extensive financial dealings with Johnston over the entire 5 years were for a consideration and not gratuitous. *125 For the years 1952 and 1954, respondent's imposition of the fraud penalty is sustained for similar reasons. Although in these years the Johnston transactions were presumably absent, the bank deposits accordingly diminished to some extent and substantial interest income was not shown to exist, we are unable to view the admitted understatements in those years independently, and apart from the remainder of the record. When the substantial [4] understatements of stationery business income and unexplained bank deposits are considered in connection with the previously found and now present badges of willful conduct, such as, for example, the failure to disclose financial data to his accountant, see E. M. Green, 11 B.T.A. 278, the inference is still required that decedent filed false and fraudulent returns with intent to evade taxes for the years 1952 and 1954, as well as for 1947 through 1951.
As for the deficiencies and additions to tax, respondent's determinations are presumptively correct. Welch v. Helvering, 290 U.S. 111. *126 The burden of proving error in these determinations consequently rests upon petitioners. Leonard B. Willits, 36 B.T.A. 294, 300; John Kehoe, 34 B.T.A. 59, 70, affd. 309 U.S. 277. On the one hand, such issues as additional costs, if any, for the stationery business (Issue 1) and salary income (Issue 4) must be disposed of against petitioners in the absence of any evidence which effectively rebuts the presumption of correctness. On the other hand, while neither party could offer precise facts and figures as to the nature of the deposits attributable to Johnston's activities and hence not taxable to decedent (Issue 3), we have revised respondent's determinations for several of these years on the authority of Cohan v. Commissioner, (C.A. 2) 39 F. 2d 540, after finding that some, if not many, of these amounts represented checkcashing services rendered by decedent. See Estate of Robert Lyons Hague, supra; Rogers v. Commissioner, (C.A. 7) 248 F. 2d 452, affirming T.C. Memo. 1956-171. However, as to the year 1953, different considerations exist. During 1950 and 1951, decedent loaned at least $9,000, *127 as represented by certain checks and notes, to Johnston who was adjudicated a bankrupt in 1951. Even though decedent did not subsequently file a formal claim in the bankruptcy proceeding, he was listed initially among the potential creditors. We agree with respondent that the mere adjudication in the earlier year was not sufficient to establish the fact of worthlessness. See P. H. Gill & Sons Forge & Machine Works, 7 B.T.A. 1146. But in 1953, when the trustee's final distributions were made and only token satisfactions were received by creditors, the unsatisfied claims held by decedent against Johnston amounting to at least $7,380 are shown to have been virtually worthless and were deductible to the extent of 95 per cent as business [5] bad debts under section 22(k), I.R.C. 1939. We have reached this result by accepting the testimony of Johnston, a witness produced by respondent, which, if not precise and categorical, was at least some evidence in support of the claimed deduction. Since the unreported business bad debt exceeded the net income creating the deficiency, both the determined deficiency and the additions to tax under sections 293(b) and 294(d)(2) are disapproved. *128 The additions to tax under section 294 must be recomputed. Accordingly, and to take into account our adjustments along with those for items abandoned and conceded, Decisions will be entered under Rule 50. Footnotes
*. Sec. 6653(b), I.R.C. 1954↩.
1. For the year 1952, the parties stipulated that the total amount of checks deposited in Corn Exchange was $1,548.07.↩
*. Not indicated by the record.↩
*. Not indicated by the record.↩
*. Year not indicated by the record.↩
2. "The frequency of transactions * * * coupled with the profit motive * * *." (Petitioners' brief.)↩
3. Respondent's agent testified that he attempted to ascertain costs and expenses for 1947 and 1948 and "could obtain no indication of expenses for those two years." On cross-examination, he conceded that Granat would have "netted" in 1948 something "less than the total amount of gross sales * * * determined."↩
4. Decedent omitted stationery business income amounting to 53 per cent and 71 per cent of the adjusted gross income reported on the respective returns for those years.↩
5. Having determined that Granat engaged in a "money-lending" business, respondent inferentially concedes business bad debt treatment.↩